**People of State of Illinois, Defendant in Error, v. Billy Bobczyk, Plaintiff in Error.**

**Gen. No. 45,294.**

**Opinion** filed May 9, 1951. Rehearing denied June 25, 1951. Released for publication July 5, 1951.

Francis T. McCurrie, Public Defender of Cook county, and Gerald W. Getty, Assistant Public Defender of Cook county, for plaintiff in error.

John S. Boyle, State's Attorney of Cook county, for defendant in error; William J. McGah, Jr., John T. Gallagher, Rudolph L. Janega, Arthur Manning, and Isadore Rosin, Assistant State's Attorneys, of counsel.

Mr. Justice Lewe delivered the opinion of the court.

Plaintiff in error, Billy Bobczyk, hereinafter called defendant, was charged with driving a motor vehicle

while under the influence of intoxicating liquor, in violation of Paragraph 144, chapter 95½, Motor Vehicle Act, Ill. Rev. Stat. 1949 [Jones Ill. Stats. Ann. 85.176], State Bar Edition. Trial by the court without a jury resulted in a finding of guilty and judgment was entered accordingly. Defendant appeals.

About 5:10 o'clock p. m. on October 23, 1949, automobiles driven by Joseph Sierminski and defendant collided at the intersection of Ashland Avenue and Superior Street in the City of Chicago. Shortly after the collision two City police officers appeared at the scene of the accident.

According to the testimony of the police officers and Sierminski, defendant's breath smelled of alcohol, his speech was incoherent, and he swayed while walking.

About 6:45 p. m. of the same evening defendant was taken by the police to the Chicago Police Scientific Crime Detection Laboratory where he voluntarily submitted to a test on the Harger drunkometer, a device used to test the alcoholic content of a subject's breath. Daniel T. Dragel, Evidence Evaluator at the Crime Detection Laboratory, who operated the drunkometer, testified that the test applied to the defendant disclosed that he had a concentration of alcohol in the blood of .30 per cent, and that in his opinion defendant was under the influence of alcohol at the time of his arrest. The police officers who arrested defendant gave similar opinions.

Defendant testified that before the collision he drank two glasses of beer; that he had not consumed any other alcoholic beverages during that day; that when he was taken to the Crime Detection Laboratory he was not informed of the purpose of the breath test, nor was he told by Dragel or the police officers that he need not consent to the test; and that upon his refusal he was advised that the test was "according to law."

Defendant contends that the trial court erred in permitting the introduction of evidence concerning the drunkometer test and the result shown thereby, on the ground that the drunkometer has not received general scientific recognition as an accurate index of the amount of alcohol in the blood.

The underlying theory and operation of the drunkometer was explained in great detail by the State's witnesses, Dr. R. N. Harger the inventor, Dr. Clarence Muehlberger, and Dragel a graduate chemist and employee of the City Police Department for fifteen years.

In making the test it appears that the subject inflates a small balloon. The exhaled breath of the subject trapped in the balloon is then allowed to pass through a reaction chamber which contains measured amounts of potassium permanganate and sulphuric acid. When a certain amount of alcohol passes through the solution it causes a change in the color of the chemicals. The concentration of alcohol in the breath can be computed from the amount of breath required to cause the chemical reaction, and from this the alcoholic content of the subject's blood. There is two thousand times as much alcohol in a given amount of blood as there is in a like amount of the breath of the same subject.

Dragel testified that he had taken courses in chemical tests for intoxication at Northwestern University under the supervision and instruction of Dr. Harger, Dr. Clarence Muehlberger and Dr. Heise, Chairman of the Committee of the American Medical Association, to study chemical tests for intoxication; that in the past two years he has conducted more than five hundred chemical tests for intoxication; and that the percentage of alcohol in the blood is not the same in each person after drinking the same amount of alcohol, for the reason that some persons will oxidize alcohol slowly and absorb it rapidly, and others will absorb it slowly and oxidize it rapidly, thus the amount of

alcohol accumulated in the blood stream will vary from time to time after consumption. The witness further testified that the drunkometer test applied to defendant indicated the accumulation in his body of alcohol equivalent to that of about ten ounces of one-hundred-proof whiskey or in ten full bottles of beer.

Dr. R. N. Harger, Professor of Biochemistry and Toxicology at the Indiana University School of Medicine, testified that for several years he had been consultant on poisons for the Indiana State Board of Health; that for the past twenty-five years he has conducted research on toxicology and alcohol; that in approximately one thousand tests he has taken blood and breath of the subject at the same time; that he has conducted thousands of breath tests and he found that by means of the breath method he can accurately predict the percentage of alcohol in the blood and that all persons would be under the influence of alcohol when the alcoholic blood content is above .15 per cent.

Dr. Clarence Muehlberger, a toxicologist, employed by the Michigan Department of Health Laboratory for the past eight years testified that from 1930 to 1941 he was a coroner's toxicologist in Cook county; that during this period he was a Professor of Toxicology in Northwestern University, University of Illinois College of Medicine, and University of Chicago Medical School; that since 1923 he has made innumerable tests of breath, blood, urine, saliva, and organs, to determine their alcoholic content; that alcohol is absorbed from the gastrointestinal tract into the bloodstream which distributes it to all parts of the body; that alcohol thus distributed has a numbing effect on the nerves of the body and that there is a progressive deterioration of nerve function which causes varying degrees of intoxication; that alcohol which enters the lungs is excreted in the breath; that the concentration of alcohol in the breathed air is about one two-thou-

sandth of the concentration of alcohol in the blood; that all persons having an alcoholic blood content above .15 per cent are under the influence of alcohol; and that the amount of alcohol in the blood of a subject may be reliably and accurately determined by the amount of alcohol in the breath, by means of the Harger drunkometer.

Defendant relies on *People v. Morse,* 325 Mich. 270, 38 N. W. (2d) 322, an appeal from a conviction of negligent homicide, in which the admission into evidence of testimony concerning the Harger drunkometer and the results of the test was held to be reversible error. In that case there was testimony for the State by two policemen, both trained in chemistry, one of whom studied the drunkometer for one month under direction of Dr. Harger and then instructed the other, and by a doctor who worked as a student assistant to Dr. Harger. Five doctors called by the defense testified in substance that most of the medical profession did not consider the device reliable.

In the more recent case of *McKay v. State* (Tex. Crim. App.), 235 S. W. (2d) 173, the defendant was charged with the same offense and raised the same objections as in the case at bar. There the court held that evidence of the result of the Harger drunkometer test was admissible.

The question here presented has never been ruled on by the courts of review in Illinois.

Since the decision in *People v. Morse,* 325 Mich. 270, 38 N. W. (2d) 322, Northwestern University (Illinois) published a treatise on the subject of chemical tests to determine intoxication. In an exhaustive study of the decisions and legal literature upon this subject the author, Robert Donigan, a member of the Chicago Bar, shows the need of a scientific means of determining with certainty the degree of intoxication resulting from the amount of alcohol in the blood, in order to

eliminate guesswork and speculation, particularly in so-called ''borderline cases.'' He says, at page 15, ''Scientists through experiments on humans and animals have established the fact that blood alcohol concentration parallels the degree to which a person may be under the influence of such alcohol, i. e., the amount of alcohol in the blood stream is an accurate index as to the amount of alcohol in the brain or other nerve centers of the body. Thus, to obtain and analyze a sample of blood of the suspect at the time of or immediately after the violation is the next most reliable method of determining to what degree he may be under the influence of intoxicating liquor. Scientists also have established the fact that the amount of alcohol excreted through the kidneys and lungs parallels the amount of alcohol the blood is carrying to the kidneys and the lungs. So by obtaining and analyzing samples of the urine or breath and measuring the amount of alcohol therein, an accurate and reliable estimate of the concentration of alcohol in the circulating blood can be obtained by chemical and mathematical calculations. (See Ladd and Gibson on '*Medico-Legal Aspects of the Blood Test to Determine Intoxication,*' 24 Iowa Law Review 194–200). These latter two methods now are used by a large number of law enforcement agencies.''

Medical science recognizes sixty pathological conditions which produce symptoms similar to those produced by alcohol, yet the law permits nonexpert lay witnesses to testify to objective symptoms commonly associated with alcoholic intoxication on the theory that sobriety or intoxication are matters of common knowledge. See *Suppe v. Sako,* 311 Ill. App. 459, 36 N. E. (2d) 603; and *Cox v. Hrasky,* 318 Ill. App. 287, 47 N. E. (2d) 728.

Defendant argues that there is a lack of unanimity in the medical profession as to whether intoxication can be determined by breath. Even so we

510

think this objection goes to the weight of the testimony and does not destroy its admissibility. The evidence in this case shows that the experts called by the State are eminently qualified in the field in question. In our view the opinion in the case of *McKay v. State* (Tex. Crim. App.), 235 S. W. (2d) 173, is best reasoned and most analogous to the present case. In this case, as in *McKay v. State,* we think the evidence is sufficient to warrant a finding by the trial court that defendant was under the influence of intoxicating liquor, so that his driving ability was impaired within the meaning of the statute, without evidence of the result of the drunkometer test. But since we hold that evidence of the breath test is admissible the State is not compelled to rely solely on the opinions of nonexpert witnesses to prove the offense charged.

██ Defendant insists that the evidence concerning the drunkometer test and the result thereof constitute an unlawful search and seizure and a denial of the privilege against self-incrimination. All cases in which constitutional questions are raised must be taken directly to the Supreme Court on error or appeal, and the rule is well established that if such a case is taken to this court, assigning errors of which this court has jurisdiction, the party suing out the Writ of Error is held to have waived the constitutional questions. See *People v. Terrill,* 362 Ill. 61, 199 N. E. 97.

For the reasons given, the judgment is affirmed.

*Judgment affirmed.*

BURKE, P. J. and KILEY, J., concur.